# EDWARD WILSON v. ALEXANDER GEORGE.

High Court of Errors and Appeals.   June 15, 1818.

*Ridgely's Notebook II, 110.*

* This case is also reported in *Clayton's Notebook, 178.*

*McLane* and *Vandyke* were counsel for the appellants. After stating their points they submitted the case without argument, as *Broom* and *Wailes,* the counsel for the petitioner, the respondent, did not attend the court.

BOOTH, Chief Justice of the Court of Common Pleas, then read a very long opinion giving the reasons upon which that court [below] rendered a judgment in favor of the petitioner.

———

This Court kept the case under consideration till June 15th; then CHANCELLOR RIDGELY, said the sole question which this

Court has had to consider is whether the respondent, the petitioner below, is entitled to his freedom, and whether it should be adjudged and decreed that he is and shall be free and at liberty, and shall and may enjoy all the benefits and advantages that a free Negro or free mulatto may or can do within this government. It is to be observed that we are not about to decide any question of property; the mere matter to be determined is whether he is entitled to his freedom according to the laws of the state.

The first Act of Assembly which relates to this subject is "An Act for the better regulation of servants and slaves within this government," 1 Del.Laws 210. The tenth section recites that "whereas it is found by experience, that free Negroes and Mulattoes are idle and slothful, and often prove burthensome to the neighbourhood wherein they live, and are of evil example to slaves; Therefore be it enacted by the authority aforesaid, That if any master or mistress, shall, by will or otherwise, discharge or set free any Mulatto or Negro slave or slaves, above the age of thirty-five years, or decrepid or infirm, he or she, or his or her executors or administrators, at the next respective County Court of Quarter Sessions, shall enter into a recognizance with sufficient sureties, to be taken in the name of the Treasurer of the said County for the time being, in the sum of Thirty Pounds, for each slave so set free, to indemnify the county from any charge they or any of them may be unto the same, in case of such Negro or Mulatto's being sick, or otherwise being rendered uncapable to support him or herself; and that until such recognizance be given, no such Mulatto or [1] Negro shall be deemed free." That Act was passed the 13th of George II, about the year 1740, or 1741. Afterwards, October 31, 1767, a Supplement was passed with the same preamble as the original Act, with this addition, that "the abovementioned act, for the further and better regulation of servants and slaves, has not been found to answer all the good purposes thereby intended," therefore it is enacted, "That if any master or mistress shall, by will or otherwise, discharge or set free any Mulatto or Negro slave or slaves, he or she, or his or her executors or administrators, at the next respective County Court of Quarter Sessions, shall enter into a recognizance with sufficient sureties, to be taken in the name of the Treasurer of the said county for the time being, in the sum of Sixty Pounds for each slave so set free, to indemnify the county from any charge they or any of them may be unto the same, in case of such Negro or Mulatto's being sick,

---

[1] At this point, *Ridgely's Notebook, II, 113,* the account of this case is interrupted; it is resumed at *149.*

or otherwise rendered incapable to support him or herself; and that until such recognizance be given, no such Negro or Mulatto shall be deemed free." 1 Del.Laws 435.

Here we perceive why the legislature declared that the former Act had not been found to answer all the good purposes thereby intended, for they exclude all slaves in the last Act of every age, and whether decrepit and infirm, or sound and healthy, from the rights of freedom, unless a recognizance was given in £60 to indemnify the county. The county in all probability had been subjected to the maintenance of Negroes and mulattoes who were not sound and were incapable of supporting themselves, and therefore to prevent imposition in future, it was declared that no slave should be set free until the recognizance was given, and more effectually to secure the county, the sum was increased to £60 for each slave.

Here it might have been reasonably supposed that the words of these Acts were so explicit that no doubt could have been entertained that the recognizance was an essential requisite to the manumission of a slave. And so perhaps they were considered until some time between the years 1783 and 1787, when a petition was preferred to the Court of Common Pleas in Kent County on behalf of a slave named Teresa or Rose [——] [2] against McGarment or some other person. In that case no recognizance had been given, and yet the court did deem and did adjudge the petitioner to be free. The cause was carried on appeal to the Supreme Court, then composed of William Killen, Chief Justice, and David Finney and John Jones, Associate Justices. It was argued on the part of the petitioner by Mr. Bassett, and for the master by Mr. Tilghman. The Associate Justices overruled the Chief Justice, and the Negro was finally adjudged to be free. The success of this petitioner produced many other cases of the kind, and many Negroes, the descendants of the original petitioner, were adjudged to be free without any recognizance, on the precedent established in the first case. These decisions were supposed to be warranted by the decisions made in England on the Statutes of Elizabeth to restrain ecclesiastical corporations from letting longer leases than for three lives or twenty-one years, but they were not acquiesced in with satisfaction; it was known that Mr. Killen, whose judgment was very sound, dissented, and the probability was that contrary decisions might thereafter be made.

To settle the law and to remove all doubts, as I have hitherto always supposed, the legislature took the subject into consid-

---

2 Blank in manuscript.

eration, and on February 3, 1787, 2 Del.Laws 885, with a view to the very question before this Court, in section 3, declared that "whereas some doubts have arose whether a Negro or Mulatto slave, heretofore manumitted by his master or mistress, by writing, last will, or otherwise, without having entered into the security to indemnify the county, required by the several laws of this state, could be entitled to his or her freedom; to remove all [such] doubts, Be it enacted, That where any master or mistress may have heretofore manumitted and set free any Negro or Mulatto slave, that is now above the age of twenty-one years, and who at the time of such manumission was not above the age of thirty-five years, and who was healthy and no ways decrepit, or rendered incapable of getting his or her living, without having given the security to indemnify the county, required by the laws of this state, shall and is hereby declared to be absolutely free, in as full and ample a manner to all intents and purposes, as if the security aforesaid, required by the laws aforesaid, had been given." And in the sixth section of the same Act, page 885, "That any master or mistress, after the passing of this act, may by any last will in writing, or otherwise, manumit and set at liberty, any Negro or Mulatto slave above the age of eighteen years, and under the age of thirty-five years, [who is healthy,] and no ways decrepit, or rendered incapable of getting his or her living, without giving the security required by any of the laws of this state; any law, usage, or custom to the contrary in any wise notwithstanding."

Now, according to the declaratory section of this Act, all slaves who had been manumitted and were then, at the date of the law, under the age of twenty-one years, and all who at the time of their manumission were above the age of thirty-five years, were still to be deemed slaves unless the security required by the laws, had been given. This Act, if it could have any effect in declaring the law, as it was intended, and is expressed, reversed the former decision, or gave a contrary exposition of the former Acts with respect to slaves who were under twenty-one, at its date, or above thirty-five at the time of their manumission. That second section was passed to remove all doubts, and it would be most extraordinary, if it should leave the question, with respect to slaves under or above the periods limited in it, a matter of uncertainty. That declaratory section, though, has no particular application to this petitioner, for he was not born at the date of the law, and is not either included or excluded by it, but it has great weight in showing the intention of the legislature. It secured the freedom of such only as then, or at the date of their manumissions, were not likely to become

burdensome to the county. It kept in view the principle of the former Acts, an exemption of the county from the burden of their maintenance; and the sixth section, with respect to future manumissions not only left the former Acts in full force, but entirely reenacted them, except in the cases therein excepted. It was made with a view to regulating the subject, to establish the law upon a point that had been doubted, and to remove those doubts.

How, though, can any doubts be removed if the law is still uncertain? Why did the legislature declare that all slaves who had been manumitted under twenty-one, and no recognizance given, but who at the date of the law were twenty-one, should be absolutely free, if they were so by the operation of law without this Act? Or why did the legislature enact that after the passing of that Act all slaves above the age of eighteen, and under the age of thirty-five, who are healthy, and not decrepit nor incapable of getting their living, might be manumitted without the security required by the laws of this state being given, if the law were so before? It is very evident why they so enacted. It was to settle the law, to remove doubts, and permanently to regulate all future cases.

Another Act was passed concerning negro and mulatto slaves on January 18, 1797, 2 Del.Laws 1321. The principal object of that law was to regulate the mode of manumitting slaves; and after the necessary provisions on that subject, in the sixth section it is enacted "That the security required by the laws of this state to be given by any master or mistress on liberating or manumitting his or her slave, shall be given according to the true intent and meaning of such laws; any thing herein contained to the contrary notwithstanding."

Here are four Acts, all upon the same subject, all requiring security to be given, and yet this petitioner claims his freedom in the face of all the provisions in these Acts!

Alexander George was born about December 21, 1787, at any rate after February 3, 1787. His master, Thomas Rothwell, never manumitted him in writing, nor by any express act, in any other manner. If George ever became free, it was by some implied manumission, for there never was any act done by Rothwell, or by Wilson, the appellant, the administrator of Rothwell, which was intended as a deed or act of manumission.

As to implied manumission. According to the Act of February 3, 1787, a slave under the age of eighteen and above the age of thirty-five, cannot be manumitted unless security be given to indemnify the county; but as no security was ever given, there can

be no implied manumission, for before Alexander George arrived to the age of eighteen years, an Act was passed, to wit, on January 18, 1797, which requires all manumissions to be in writing signed and sealed by the master or mistress or else they shall be void. According to that Act a slave can be manumitted in one of four ways only: first, by a last will; second, by a writing signed and sealed; third, by an importation of a slave contrary to law; and fourth, by an exportation, or sale with an intention for exportation, contrary to law. If the slave be manumitted by last will, or by writing, under eighteen or above thirty-five years of age, or if he be within those ages, and be unhealthy or decrepit, or incapable of getting his living, the security required by law must be given, or the manumission will not avail. Therefore it is that nothing done or said, or omitted to be done, either by Rothwell or Wilson his representative can operate as a manumission.

There is no ground in supposing that any Act of a master can be good against himself, and therefore operate as a manumission, when the security required by law is not given. Those Acts of Assembly cannot be compared to the statutes which restrain ecclesiastical leases. By the common law ecclesiastical corporations might make as long leases as they thought proper; the mischief was that they let long and unreasonable leases, to the impoverishment of their successors; the remedy applied by the Statute was the making void all leases by ecclesiastical bodies for longer terms than three lives, or twenty-one years. Now, in the construction of this Statute it is held that leases, though for a longer term, if made by a bishop, are not void during the bishop's life; or if made by a dean and chapter, they are not void during the life of the dean; for the Act was made for the benefit and protection of the successor. The mischief is therefore sufficiently suppressed by vacating them after the death of the grantors; but the leases during their lives, being not within the mischief, are not within the remedy. 1 Bl.Comm. 87.

And so with respect to mortgage deeds. No such deed is good, or sufficient to pass any freehold inheritance, or to grant any estate therein for life or years, unless such deed be acknowledged, or proved and recorded in the county where the lands or tenements lie, within twelve months after the date thereof. 1 Del. Laws 222. And yet in Pennsylvania where their Act of Assembly requires mortgage deeds to be recorded in six months, it was adjudged that a mortgage deed, though not recorded within six months, is good against the mortgagor; because the intent and principal reason of the law is "to prevent honest purchasers, or mortgagees, of real estates, from being deceived by prior secret

conveyances, or incumbrances." 1 Dall. 430. But it did not fall within the mischief, and consequently it was not within the remedy, or reason and spirit of the law, to make such deeds void as to the mortgagor; for although unrecorded for more than the limited period, he could not thereby be injured, for he had full notice of its existence, and could not possibly be affected by its being unrecorded. The law was made for the protection of subsequent purchasers and creditors, and not for the benefit of the mortgagor. The reason of the decisions on ecclesiastical leases were strictly applicable to this case of unrecorded mortgage; and in both instances the courts conformed to the spirit and intention of the law-makers.

Our laws to restrain masters from manumitting slaves without giving security to indemnify the county were made for the good or benefit of the government. They are laws of public police or economy. They were not made for the benefit or advantage of masters, nor for the protection or security of slaves. They do not, so far as they relate to the security to indemnify the county, regulate or concern any private interest, or give, or take away or secure, or protect, any private, existing vested right, and were not designed for any such purpose. They merely affect the government, and declare the terms upon which a master may emancipate a slave and make him a free man. And in this there is nothing hard or unreasonable, for if the master means fairly to extend the blessing of freedom to his slave he will not hesitate about the terms. There is no reason that a master who has received the benefit of the labor of a healthy vigorous slave should cast him in his old age on the public charity.

Before our Acts requiring security to indemnify the county were made, a master might liberate a slave incapable of supporting himself, without obliging himself to maintain him; the mischief was that slaves were so liberated as to be burdensome to their neighborhood. The remedy applied is security to indemnify the county. Now if a slave can be manumitted (except in the cases excepted) without such security, the mischief is not suppressed, and the remedy is not advanced; but it is the duty of judges to construe Acts to suppress the mischief and advance the remedy; and therefore without the security this Negro cannot be adjudged free. There can be no judgment against the master in favor of the slave and yet leaving the master responsible for his maintenance in case of his incapacity to maintain himself. The Act of Assembly has prescribed the terms of the judgment. If any judgment is rendered for the slave, it must be that he is and shall be free and at liberty, and shall and may enjoy all the benefits and advantages that a free Negro or free

mulatto may or can do within this government. If after such judgment is rendered he is a free man to all intents and purposes, the master is not bound for his support, and consequently in case of incapacity the public would be burdened with him.

If a slave under eighteen and above thirty-five can be adjudged free in any case without the security, he may in every case, and consequently the law becomes void. This, though, is not the sound construction of the law. If the manumission is good against the master, it is good against the state or county, and one could no more avoid it than another; but it is void as to both. The construction of our Acts is analogous to the construction of the [Statute] 17 Geo. III, c. 26, which declares that all deeds whereby annuities are granted shall be null and void to all intents and purposes, unless a proper memorial be registered according to the method prescribed by the Act. This Statute was made to suppress a public evil, the taking advantage of distressed men; and strong as the words are that such deeds shall be null and void to all intents and purposes, they are not more so than the words of our Act, that until such recognizance be given, no such Negro or mulatto shall be deemed free. 2 Term 603. So by Statute, 9 Anne, c. 14, all notes where the whole or any part of the consideration is money knowingly lent for gaming, shall be void to all intents and purposes whatsoever. And in a case where a note for money lent to one knowingly to game with was indorsed over for a valuable consideration, yet it was adjudged to be void, 2 Str. 1155. So by Statute, 12 Anne, c. 16, it is enacted that no person shall upon any contract take for the loan of any money, wares, etc. above the value of £5 for the forbearance of £100 for one year; and all bonds and assurances for payment of money, whereon shall be reserved or taken interest above £5 *per centum* shall be void. Although this Statute has often been attempted to be evaded, yet the courts have uniformly supported its spirit; for however disguised the agreement might be, if in fact it was usurious it has been held to be void.

All these Acts, as well as our Act about security to indemnify the county, were made on public principles to regulate matters of public concernment, and they never can have effect unless they operate upon the very cases intended to be controlled. There can be no medium; the law must have its full operation, or it can have none, for let the Negro be once adjudged to be free, he, in case of inability to support himself, is unavoidably thrown upon the public, without any possible redress against the master.

I have little to say with respect to the supposed gift made by Rothwell of this boy to his parents. They were then both

slaves, and a slave cannot acquire or hold property in this state. They cannot sue or be sued, and without the permission of the master no person can deal with them. The condition of a slave is more restricted with us than villeinage was in England; and there all acquisitions of property real and personal made by a villein, in whatsoever way arising, with no other exception than what is allowed of to prevent prejudice to third persons, belonged to his lord, because an incapacity to acquire anything for his own benefit was one of the harsh characteristics of the villein's condition. Co.Litt. 117a, note 1. If this gift amounted to anything, it certainly could not operate as a manumission of Alexander George; neither could it operate as a manumission of the mother, unless she was older than eighteen years and not exceeding thirty-five, and no ways decrepit or rendered incapable of getting her living, for in both cases security to indemnify the county would be necessary, according to circumstances. However the freedom of the mother is not the inquiry, because no question is made about it, and no facts relating to her are before the court; and all that I have to observe touching the effect of this supposed gift as it related to Alexander George is that it was not a manumission of him. For if it divested Thomas Rothwell of any property, it would remain to be considered in whom it vested the right of the boy; it could not be a manumission, for he was then but three years of age, and no security was given.

As to the paying wages by Wilson to Alexander George, if this fact were ever so clearly made out, it would not amount to a manumission, because according to the "Act concerning Negro and Mulatto slaves," passed January 18, 1797, 2 Del.Laws 1321 [s. 1], it is declared that "no Negro or Mulatto slave shall be set free and at liberty, nor discharged from the service of his or her master or mistress, or masters or mistresses, by the adjudication or decree of any court whatsoever, in virtue or in consequence of any verbal contract or agreement hereafter made by such master or mistress, or masters or mistresses; but that every such contract and agreement shall be null and void, and shall not be binding or obligatory upon such master or mistress, or masters or mistresses." By this Act a slave cannot be adjudged free in virtue of any verbal contract. The words are certain, and the intention of the legislature is equally clear and certain. The legislature intended to abolish all verbal contracts for the manumission of slaves, and, as much as could, all suits arising out of any verbal contract. It would be extraordinary that a direct, positive, valid manumission, made in the presence of witnesses, should be null and void; and yet that an indifferent transaction

happening without a view to, or in relation to, a manumission should avail, and thus defeat the Act of Assembly. The very spirit and intention of the Act was to confine the manumission of slaves, in every instance, to a deed or last will, except upon an importation, or exportation, or selling with an intention of exportation, contrary to law; and it would be an evasion of the law to allow that to be done indirectly which could not be directly done. And especially to deem that a manumission which was not intended to be such by Wilson.

As to the binding to Harman, and the knowledge which Rothwell and Wilson had of the place of residence of Alexander, and that he acted as a free man, nothing of the sort can avail against the express provisions of the law. The security and the manumission in writing, in the cases before mentioned, are indispensable; and although the county might never incur any expense in the support of this petitioner, yet if the law were to be evaded by setting up a claim against a master and considering it as a case depending altogether upon the interest of the master, and upon his acts, without any regard to the policy of the law, and the security intended to be provided for the county, all the unhealthy and decrepit slaves, and all such as are incapable of getting their living might be immediately thrown upon the public and made a county charge.

Inasmuch, then, as no security was given by Thomas Rothwell or by his representative, according to the terms of the Acts of Assembly, before Alexander George arrived to the age of eighteen years, to indemnify the county, and as George was not manumitted in writing signed and sealed by his master, I think that he is not entitled to his freedom, and that the judgment of the Court of Common Pleas should be reversed.

JOHNS, Chief Justice of the Supreme Court, PAYNTER, Justice of the Supreme Court, and COOPER, Justice of the Court of Common Pleas concurred. DAVIS, Justice of the Supreme Court, *dissentiente*.

PER CURIAM. Judgment reversed.